

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-09-00343-CR

MICHAEL ANTHONY ALMENDAREZ                    APPELLANT

V.

THE STATE OF TEXAS                    STATE

----------

### FROM THE 271ST DISTRICT COURT OF WISE COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In four issues, Appellant Michael Anthony Almendarez appeals his conviction for one count of indecency with a child and one count of sexual assault of a child.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

While on parole for an unrelated conviction, thirty-four-year-old Almendarez moved in with his mother (Charlotte), his stepfather, and S.B., his sixteen-year-old stepsister. According to S.B., he started regularly supplying her with mixed drinks containing Everclear alcohol and getting her drunk when her father and stepmother were at work, asleep, or otherwise not around. According to S.B.'s then-fifteen-year-old best friend Shelby Crowley, Almendarez called Crowley and told her that he had gotten S.B. drunk one weekend and, while giving S.B. a foot massage, "one thing led to another" and, over S.B.'s clothes, he touched the inside of S.B.'s thighs and rubbed on her genital area.

On May 3, 2008, after Almendarez supplied some Everclear-based mixed drinks to S.B., S.B. became intoxicated. Almendarez helped S.B. to bed and left her room. S.B. awoke later to find Almendarez next to her in bed, her hand on his erect penis. S.B. passed out and awoke a second time to find that she was naked and that Almendarez had his tongue on her female sexual organ. S.B. passed out again. When she awoke a third time, she found Almendarez on top of her, with his penis inside her female sexual organ. S.B. told him to stop, pushed him off, passed out again, and when she awoke, she told Almendarez to leave her room.

The following day, Almendarez wrote S.B. an apology letter that described the assault in detail and asked for S.B.'s forgiveness. S.B. tore up the letter and threw the pieces in the trash can in her bedroom. Almendarez wrote S.B. two

2

more letters and a poem. S.B. left the second letter and poem on her bed, but she tore up the third letter and also put it in the trash can in her bedroom.

Later that week, S.B. told Crowley about the assault. After school, Crowley and S.B.'s friend Kelsey Knighten confronted Almendarez at work, and he admitted to them that he had sex with S.B. on May 3, when they were drunk. The next evening, Crowley told her stepfather about the assault. Crowley, her mother, and her stepfather went to S.B.'s family's trailer to provide support for S.B. when she told her father and Charlotte about the assault. S.B. went outside to meet them, and when her father and Charlotte joined them, S.B. told them about the assault. Almendarez stayed inside.

Crowley's mother called 911, and two sheriff's deputies responded to the call. One deputy entered the trailer to speak with Almendarez, and the other remained outside with S.B., S.B.'s parents, Crowley, and Crowley's parents. At some point, Charlotte entered the trailer and asked Almendarez about whether he had given S.B. alcohol, and he admitted to her that they drank alcohol together on the night of the assault.

S.B. told the deputy that Almendarez had written her some letters and that they were in her bedroom. Because neither S.B. nor her father wanted to go into the trailer, Crowley offered to retrieve the letters, and S.B. told her where to find them. Crowley entered the trailer, went into S.B.'s bedroom, and retrieved them. Crowley returned outside, taped the torn letters back together, and gave all of the documents to the deputy. Prior to trial, Almendarez filed several motions to

3

suppress these documents, which the trial court denied, and he reurged his motion during trial, which the trial court again denied.

The first letter stated:

There's nothing that I can ever say to fix my stupidity. I think that it started when you kissed me back and then started jacking me off as I rubbed you down there. Part of me knew better, but being drunk and feeling you respond back, made me think that it was ok to lick you down there. As I did . . . , and you moving with my . . . tongue and your "xxx" . . . my mind went somewhere . . . .

I should have just left then. I kept screwing up because the alcohol was kicking in stronger and stronger. I stuck it in a little & you said it hurt, and that was the only time I was inside you. Maybe 2 seconds. I remember rubbing against you, but I wasn't inside.

All of this is in case you're stressing over being pregnant. You're not.

Please forgive me [S.B.]. I've never wanted to mess up our friendship. Lots of people have gotten drunk & done things they regretted. Please understand it was alcohol. I love you. I don't regret part of it, because you are attractive. I regret that you're uncomfortable and stressed, and scared. I'm pouring out the alcohol today, and I'll never drink in your house again or be drunk around you. I love you enough to do my best to make it right for the future. I will leave if you want that. I won't be mad. I really am sorry. Just please give me another chance to be normal with you. It hurts to think that I am shut out of your life, but I can accept your decision.

I wish you the best in life and you'll always be in my heart.

I'm sorry.

The second letter stated:

When I was on my knees holding your hands, the way that you left made me realize that I needed to give you your space and get another job.[2]

_____
[2]S.B. and Almendarez worked together at a barbecue restaurant.

4

Your feelings matter to me.  I would prefer your happiness over mine.  When I'm at work, I get pleasure from talking smack to everyone that's entertaing [sic] it, because they laugh.  I receive pleasure from giving other people pleasure.  So I put on my game face lately, even though I'm uncomfortable knowing that you don't want me around you.

To be perfectly honest as I can with you, you have some of the best <u>qualities</u> in anyone that I've ever met.  But I've brought you unhappiness.  If I thought that by dropping Stephanie and trying to feel your pain, and even trying to date you, would somehow make it right; so that you wouldn't assume that I would "hit something & then quit something . . ."  I would.

If I thought that there were someway [sic] to regain your trust, I would.

If I thought that by leaving a job that I need, to give you your space, would make you happier, I would.

If I thought that by moving I could bring you more happiness, I would.

I love you and would do my best to prove it to you.

I have historically screwed things up.  I've never tried to make things right, but this time I want to because I'm motivated by love.

I don't expect you to believe me or to even finish reading this.

You are very special to me and because of this, I put your happiness first.  You have been my joy for so long.  You've made me feel at peace.  You're so wonderful in so many ways.  And I've ruined our relationship.

I'll stay out of your way, and your space, for your happiness, and hopefully, someday, you'll see that I really did care.

The only other option is for me to do something before you hate me worse.

Take Care

In the poem, entitled, "An Angel," Almendarez blamed himself for making an angel upset; in the last letter, he asked S.B. to pray with him.

Almendarez was arrested that night on an administrative warrant for a parole violation. S.B. went home with the Crowleys, and the next morning, Crowley's mother took S.B. to a hospital, where she underwent a sexual assault examination. Because of the length of time that had elapsed between the assault and the examination, no physical evidence was taken from S.B.

After further investigation, the State charged Almendarez with one count of indecency by contact—causing S.B. to touch his genitals—and one count of sexual assault of a child—causing S.B.'s sexual organ to contact his sexual organ.

Almendarez denied that he had provided alcohol to S.B. but admitted that they had been drinking alcohol together on the night of the assault. He said that they had been watching comedies on the internet when S.B. spilled her drink on the computer keyboard. S.B. started throwing up on the rug near the computer while Almendarez cleaned up the spill. He denied sexually assaulting S.B. or that they had had any sexual relationship. Almendarez said that they had a conversation the next day on the way to work about how upset he was about S.B. spilling her drink and throwing up on the rug. He told S.B. that he was going to tell their parents about it, and this made S.B. mad.

Almendarez also denied telling Crowley that he and S.B. had sex on May 3 or that he had ever called Crowley to tell her that he had gotten drunk and touched S.B. He said that Crowley demanded that he write the first letter, told him what to write, and threatened that she and S.B. would have his parole revoked if he did not. He admitted that he wrote the other two letters and the poem on his own but said that he was motivated to make a false confession by fear. Both S.B. and Crowley denied any involvement in Almendarez's letter-writing efforts. Charlotte testified that S.B.'s reputation for being truthful was bad.

After both parties rested, Almendarez asked for an article 38.23 instruction related to the legality of Crowley's acquisition of the letters from S.B.'s room. Almendarez also asserted that because both counts arose from the same incident, the application paragraph should require the jury to select from either the indecency or the sexual assault charge. The trial court denied these requests.

A jury found Almendarez guilty of both counts, and after Almendarez pleaded true to the enhancement paragraphs and the jury heard punishment evidence, the jury sentenced him to twenty-five years' confinement on each count. This appeal followed.

### III. Suppression

In his third issue, Almendarez asserts that the trial court erred by failing to suppress the letters and poem that he wrote to S.B. because Crowley's entry into his family's trailer violated his right to privacy under the United States and Texas

7

Constitutions and that the letters were thus inadmissible or, alternatively, that the trial court erred by failing to include an article 38.23 instruction in the jury charge with respect to the letters. In response, the State contends that Almendarez lacks standing to challenge Crowley's actions because he did not have a reasonable expectation of privacy in S.B.'s bedroom.

To assert a challenge to a search and seizure under the United States and Texas Constitutions and article 38.23, a party must first establish standing. *See Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); *Martinez v. State*, 236 S.W.3d 361, 367 (Tex. App.—Fort Worth 2007, pet. dism'd). Standing may be reviewed as part of the claim presented or may be raised by the court of appeals sua sponte. *Kothe*, 152 S.W.3d at 60. Standing is a question of law that we renew de novo. *Id*. at 59.

To establish standing, the defendant has the burden of providing facts to establish a legitimate expectation of privacy, and to carry this burden, he must prove that (1) by his conduct, he exhibited an actual subjective expectation of privacy and (2) circumstances existed under which society was prepared to recognize his subjective expectation as objectively reasonable. *Villarreal*, 935 S.W.2d at 138. The following factors are relevant in determining whether the defendant's subjective expectation is one that society is prepared to recognize as objectively reasonable: (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place

8

invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, prior to the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy. *Voyles v. State*, 133 S.W.3d 303, 306 (Tex. App.—Fort Worth 2004, no pet.) (quoting *Granados v. State*, 85 S.W.3d 217, 223 (Tex. Crim. App. 2002), *cert. denied*, 538 U.S. 927 (2003)). Courts must also examine the totality of the circumstances surrounding the search. *Id*. (citing *Villarreal*, 935 S.W.2d at 138–39).

Almendarez bore the burden of proof to show that he had a legitimate privacy interest in S.B.'s bedroom. *See Granados*, 85 S.W.3d at 222–23; *Villarreal*, 935 S.W.2d at 138. There is no evidence in the record showing that Almendarez had a subjective expectation of privacy in S.B.'s room or the documents. Rather, the record reflects that Almendarez gave the letters and the poem to S.B., thus surrendering any right that he had to assert a property interest in them. *See Pham v. State*, 324 S.W.3d 869, 875–76 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (stating that by giving the bag containing methamphetamine to someone else, "appellant assumed the risk that his confidant would reveal that information to the public, thus frustrating appellant's expectation of privacy"; further, by so doing, appellant lost dominion and control over the bag or its contents, relinquishing his right to exclude others from them), *cert. denied*, No. 11-61, 80 U.S.L.W. 3058 (Oct. 3. 2011). Further, there is no

9

evidence to show that Almendarez had a subjective expectation of privacy over the areas primarily occupied and controlled by S.B. *See Martinez*, 236 S.W.3d at 367–68 (acknowledging that appellant had no standing to challenge the search of his son's pants). Accordingly, he lacked standing to complain of Crowley's actions, and the trial court did not err by denying his motion to suppress. *See Voyles*, 133 S.W.3d at 306 (listing the *Granados* factors).

Furthermore, although Almendarez alternatively argues that the trial court erred by failing to include an article 38.23 instruction in the jury charge, because Almendarez lacked standing to complain about the seizure of the evidence, the trial court did not err by denying his request for the instruction. *See Chavez v. State*, 9 S.W.3d 817, 819–20 (Tex. Crim. App. 2000) (holding that because appellant lacked standing to complain about the seizure of cocaine when it was not obtained in violation of his rights, he was not entitled to an article 38.23 instruction); *Pham*, 324 S.W.3d at 874 (stating that to assert a challenge to a search and seizure under the U.S. and Texas Constitutions and article 38.23, the party must first establish standing); *Orr v. State*, 306 S.W.3d 380, 401 (Tex. App.—Fort Worth 2010, no pet.) (overruling appellant's article 38.23 point because she lacked standing when her rights were not violated). We overrule Almendarez's third issue.

### IV. Harmless Error

In his first two issues, Almendarez argues that he was denied the right to present a full defense because the trial court excluded evidence of S.B.'s specific

prior bad acts and her prior allegations of physical abuse against others and that the trial court erred by admitting evidence of his extraneous offenses without a limiting instruction.

**A. Excluded Testimony**

S.B., Charlotte, and Almendarez all testified outside of the jury's presence as set out below.

S.B. admitted to most of the misdeeds alleged by Almendarez, namely drinking alcohol, smoking cigarettes, driving her father's truck without permission or a driver's license, dating an eighteen-year-old boy and going to his house when she was not supposed to, and being late for work due to spending time with her boyfriend, but she denied smoking marijuana. S.B. admitted that she and Almendarez had a conversation about these acts around May 4, 2008, but she denied that she was upset with Almendarez for telling her that he was going to tell her parents about them.

S.B. also denied that her allegations against Charlotte for physical abuse in 2003, 2005, and 2006 were false and said that she did not make the allegations because she was mad at Charlotte. She admitted that she signed an affidavit of nonprosecution so that she could return to live with her father and Charlotte, but on cross-examination by the State, she explained that the affidavit just stated that she did not want to go forward with the charges and that she did not make any statements in the affidavit about lying about the allegations or that they were false.

11

S.B. denied making an allegation of abuse against her biological mother so that she could return to live with her father and Charlotte. S.B. also denied that she had been in a fight with a boy at church in 2004 and had assaulted him. In response to defense counsel's question about whether she would agree that the allegation that the boy had assaulted her was false, S.B. replied, "Yes. Well, no; it's not false."

Charlotte testified that in 2003, S.B. falsely accused her of physical abuse when S.B. was upset with her, and Child Protective Services (CPS) became involved. She said that CPS's investigation did not result in any charges against her. Charlotte also said that in 2005, she and S.B. had had an argument the day before she took S.B. to the airport for a visit to her biological mother, and she learned later from S.B.'s biological mother that S.B. had again made false allegations of physical abuse against Charlotte. CPS investigated again, but no charges were brought against Charlotte. Charlotte also said that in 2004, S.B. told her that a boy had assaulted her at church; after Charlotte called the police and investigated, she learned that the allegation was false.

Charlotte said that on the night Almendarez was arrested, she asked S.B. if she had been going over to her boyfriend's house instead of going straight to work after school and that S.B. first lied but then admitted that she had been doing this. S.B. also initially denied other activities such as drinking, smoking, and taking the truck when she was not supposed to; Charlotte said she did not

recall if S.B. later admitted to drinking, smoking, or taking the truck. Charlotte said that S.B. had a bad reputation for truthfulness.[3]

Almendarez testified that he had seen S.B. drink alcohol over thirty times, that he had seen her smoke cigarettes at least ninety times, and that he had seen her on several occasions take the truck on her own when she was not supposed to. He also said that S.B. told him about her eighteen-year-old boyfriend and that he had seen the boyfriend drop S.B. off at work late. When he called home to look for her once when she was late for work and later told her about this, S.B. got mad, threatened him, and told him to never call anywhere looking for her.[4]

On the day after the alleged sexual assault, Almendarez testified that when he and S.B. drove to work, he told her that everything would have to stop: the boyfriend, the cigarettes, going to the boyfriend's house, the drinking, and the truck stealing, or he was going to report the boyfriend to the police because of his age, and tell their parents. Almendarez said that he told S.B. this because when they had been drinking together on May 3, S.B. spilled some alcohol on an expensive computer, and the risk of him getting in trouble was too high.

[3]Charlotte also stated before the jury that S.B.'s reputation for being truthful was bad.

[4]Almendarez's brother, Robert Boeker, also testified outside the jury's presence that in April 2008, Almendarez told him that he had seen S.B. "running around with her dope-head boyfriend" instead of going to work after school and that Almendarez was going to tell Charlotte and S.B.'s father "because she didn't need to be running around with a pothead."

Almendarez said that S.B. then threatened that if he said anything to their parents, she was going to put him in jail first.

Almendarez also stated that he was aware of S.B.'s abuse allegations to CPS prior to May 2008 and knew that S.B. was capable and had a history of putting people in compromised legal situations. S.B. had told him that she wanted to get back to her father and Charlotte's trailer for Christmas because they had more money than her biological mother, and she wanted better Christmas gifts, so she had made false allegations against her biological mother to get back home.

The trial court sustained the State's objection to the testimony above and to Almendarez's request to admit CPS records ruling out S.B.'s physical abuse accusations against Charlotte.

## B. Limiting Instruction on Extraneous Acts

Almendarez requested a limiting instruction on his extraneous acts: Crowley's testimony about Almendarez telling her that he had touched S.B.'s thigh and genital area over S.B.'s clothes while S.B. was drunk on a prior occasion and S.B.'s testimony that he had performed oral sex on her on the night of the assault, as well as the letters' references to same.

## C. Harm

We assume, without deciding, that the trial court erred by excluding S.B.'s specific bad acts and by failing to give a limiting instruction on Almendarez's extraneous offenses.

### 1. Constitutional Error

In his second issue, Almendarez states that the trial court abused its discretion by excluding his evidence because the specific bad acts were to show S.B.'s motive for making false accusations against him. Likewise, he contends that Charlotte's testimony about S.B.'s false allegations of abuse were also admissible to show S.B.'s motive in making the accusations against him.

Both Almendarez and the State agree that a Confrontation Clause issue is not presented, although the State contends that the evidence would also have been excluded under the Sixth Amendment because there was no causal connection or logical relevance that could give rise to a potential bias or motive to testify and Almendarez, while limiting his analysis to the rules of evidence, argues that if this court disagrees that the evidence is admissible under the rules of evidence, it is "nevertheless admissible under the Confrontation Clause." Because the Confrontation Clause is implicated in this analysis, we will review the assumed error under rule 44.2(a). *See Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007) (stating that any Confrontation Clause violation is subject to harmless error analysis).

In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction or punishment. Tex. R. App. P. 44.2(a); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). Our harmless error analysis should not focus on the propriety of the outcome of the

15

trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We consider a nonexclusive list of factors, including the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden v. State*, No. PD-1524-10, 2011 WL 4467280, at *4 (Tex. Crim. App. Sept. 28, 2011) ("At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'").

The trial court excluded S.B.'s and Almendarez's testimonies about S.B.'s misdeeds (drinking, smoking, driving without permission, dating an older boy, and being late for work because of her relationship with the older boy) and about S.B.'s reaction to Almendarez's threat to tell Charlotte and her father about these misdeeds—S.B. said that she was not upset, and Almendarez said that she was and that she threatened him. However, the jury heard Almendarez testify that when he told S.B. that he was going to tell their parents about her spilling her alcoholic drink on the computer and then vomiting on the rug, S.B. and Crowley threatened that they would have his parole revoked if he did not write the first letter and that his motivation to make a false confession by writing the first letter

16

and then the subsequent two letters and the poem was fear of S.B. and Crowley.[5] Therefore, the jury still had a chance to judge S.B.'s credibility in light of her alleged threat to have Almendarez's parole revoked and, inferentially—based on the letters' content—that her threat involved the charged offenses.

Further, although the trial court excluded S.B.'s, Almendarez's, and Charlotte's testimonies about S.B.'s physical abuse allegations against Charlotte made several years before, along with the records covering the family's extensive CPS history, the jury heard Charlotte testify that S.B. had bad character for truthfulness.

In its opening statement, the State focused on Almendarez's letters. Immediately following the State's opening statement, Almendarez informed the jury in his opening statement that the jury needed to pay close attention to S.B.'s testimony, to listen "to what her motivation may be to tell something that's less than the truth,"[6] and to listen for consistency in what S.B. had told various people. He also attempted to mitigate the letters' impact, stating that the jury should

---

[5]Almendarez told the trial court outside the jury's presence that if State's Exhibits 1, 2, and 3—his letters and the poem—had been suppressed, then he would not have testified.

[6]Almendarez's counsel also stated,

> And what you're going to hear is that right around this time, right around May 9th of 2008, when she made this allegation, just before that, you're going to hear that there was some sort of a confrontation between [S.B.] and . . . Almendarez, that would cause [S.B.]—would give her motivation to accuse him of something like this.

17

determine whether "it's possible that a person could write these notes and write these letters for some motivation other than the fact that they're true."

In the first part of its closing argument, the State argued that the jurors should think about the evidence that they heard and look at the letters. Almendarez then argued that there were inconsistencies in the witnesses' testimonies, that S.B. was a liar, and that Almendarez had told the jury "that something was going on, and that he felt threatened by these girls." He further argued that Crowley had dictated the contents of the letter to him and that Charlotte had testified that S.B. was not a truthful person. The State then closed by reemphasizing Almendarez's letters, how absurd Almendarez's blackmail theory was as S.B. had torn up and thrown away two of the letters, and that the letters contained the truth.

Because the letters written by Almendarez contained explicit, graphic descriptions of the charged offenses and were admitted into evidence, and because the defense theory that S.B. was a liar with a motivation to lie and to blackmail Almendarez into writing the letters was before the jury, after carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court's alleged error did not contribute to Almendarez's conviction or punishment. Tex. R. App. P. 44.2(a). We overrule Almendarez's second issue.

## 2. Non-Constitutional Error

In his first issue, Almendarez complains that the trial court erred by "admitting evidence of extraneous acts, allegedly committed by [Almendarez], without a limiting instruction on the proper use or reasonable doubt standard."[7]

When a trial court errs by refusing to give a contemporaneous limiting instruction, that error is non-constitutional and is subject to a harmless error analysis pursuant to Texas Rule of Appellate Procedure 44.2(b). *Jones v. State,* 944 S.W.2d 642, 653–54 (Tex. Crim. App. 1996), *cert. denied,* 522 U.S. 832 (1997); *Jones v. State*, 119 S.W.3d 412, 423–24 (Tex. App.—Fort Worth 2003, no pet.). A non-constitutional error is harmless unless it affects a defendant's substantial rights. Tex. R. App. P. 44.2(b); *Jones*, 119 S.W.3d at 424. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have a fair assurance that the error did not influence the jury, or had but a slight effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In making this determination, we review, among other things, the record as a whole,

---

[7]Almendarez does not argue the propriety of entering the extraneous acts into evidence, thus we only consider any error associated with the trial court's failure to issue limiting instructions.

including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Here, the record reflects ample evidence of Almendarez's guilt because S.B.'s testimony about Almendarez's actions during the assault is sufficient to support the jury's verdict as to each of the charged offenses. In addition, the objected-to evidence was statutorily relevant pursuant to article 38.37 of the code of criminal procedure to show Almendarez's and S.B.'s states of mind and to show the previous and subsequent relationship between them. *See* Tex. Code. Crim. Proc. Ann. art. 38.37 (West 2005 & Supp. 2011). Moreover, the extraneous evidence was not more heinous or inflammatory than the evidence pertaining to the charged offenses, minimizing its prejudicial effect even in the absence of a contemporaneous limiting instruction. *See, e.g., Jones*, 944 S.W.2d at 654; *Jones*, 119 S.W.3d at 425. And the jury charge contained a limiting instruction with regard to extraneous offenses committed by Almendarez, which further reduced the risk that the jury might misuse the evidence during jury deliberations. *See Jones*, 119 S.W.3d at 425. For these reasons, we conclude that any error by the trial court by overruling Almendarez's requests for a contemporaneous limiting instruction was harmless. *See* Tex. R. App. P. 44.2(b).

## V. Lesser Included Offense

In his fourth issue, Almendarez complains that the trial court erred by not including a lesser included offense instruction in the jury charge. Specifically, he argues that because they stemmed from the same transaction, the indecency count was a lesser included offense to the sexual assault count.

We use a two-step analysis to determine whether an appellant was entitled to a lesser included offense instruction. *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993). First, the lesser offense must come within article 37.09 of the code of criminal procedure. Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006); *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). An offense is a lesser included offense of another offense, under article 37.09(1), if the indictment for the greater-inclusive offense either: (1) alleges all of the elements of the lesser included offense, or (2) alleges elements plus facts (including descriptive averments, such as non-statutory manner and means, that are alleged for purposes of providing notice) from which all of the elements of the lesser included offense may be deduced. *Ex parte Watson*, 306 S.W.3d 259, 273 (Tex. Crim. App. 2009) (op. on reh'g). Both statutory elements and any descriptive averments alleged in the indictment for the greater inclusive offense should be compared to the statutory elements of the lesser offense. *Id.* If a descriptive averment in the indictment for the greater offense is identical to an element of the lesser offense, or if an element of the lesser offense may be

21

deduced from a descriptive averment in the indictment for the greater-inclusive offense, this should be factored into the lesser included offense analysis in asking whether all of the elements of the lesser offense are contained within the allegations of the greater offense. *Id*.

Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672–73. The evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the appellant of the greater offense while convicting him of the lesser included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Hall*, 225 S.W.3d at 536.

Indecency with a child is a lesser included offense of aggravated sexual assault of a child when both offenses are predicated on the same act. *See Evans v. State*, 299 S.W.3d 138, 143 (Tex. Crim. App. 2009); *Ochoa v. State*, 982 S.W.2d 904, 908 (Tex. Crim. App. 1998) (holding that the defendant should not have been charged with both indecency with a child and sexual assault, but instead, indecency with a child should have been submitted as a lesser included offense because there was evidence of only one act by the appellant). However, separate charges of indecency with a child and sexual assault of a child are

22

proper when the evidence indicates that two separate offenses took place. *See Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004) (holding that when two penetrations were separated by a short period of time, two independent assaults occurred, and it was proper to submit two different charges to the jury); *Tyson v. State*, 172 S.W.3d 172, 178 (Tex. App.—Fort Worth 2005, pet. ref'd) (holding that in a prosecution for aggravated sexual assault of a child based on different acts occurring in the same transaction, each act is a separate offense under section 22.021 of the penal code unless one of the acts would be subsumed by another, such as contact subsumed by penetration); *Bottenfield v. State*, 77 S.W.3d 349, 358 (Tex. App.—Fort Worth 2002, pet. ref'd) (holding that even though appellant's two acts may have been committed during the same occurrence, appellant's touching of victim's genitals with his finger was a separate and distinct criminal act from touching her genitals with his penis), *cert. denied*, 539 U.S. 916 (2003).

To resolve Almendarez's challenge, we must focus on whether the evidence justified the trial court in submitting instructions that would permit the jury to convict and sentence Almendarez both for committing aggravated sexual assault and for committing indecency with a child. *See Ochoa*, 982 S.W.2d at 907. The record reflects that Almendarez committed two separate acts—penetrating S.B.'s sexual organ with his sexual organ and placing S.B.'s hand upon his penis—which constitute two separate offenses. *See In re J.H.*, 150 S.W.3d 477, 485 (Tex. App.—Austin 2004, pet. denied) (holding that defendant's

23

touching child's genitals with his fingers was separate offense from causing her genitals to touch his mouth); *Murray v. State*, 24 S.W.3d 881, 889 (Tex. App.—Waco 2000, pet. ref'd) (same); *cf. Bottenfield*, 77 S.W.3d at 358 (holding that even though appellant's acts may have been committed during same occurrence, appellant's touching of victim's genitals with his finger was a separate and distinct criminal act from touching her genitals with his penis). Therefore, here, the indecency with a child count is not a lesser included offense of the sexual assault count. *See Bottenfield*, 77 S.W.3d at 358; *Murray*, 24 S.W.3d at 889 (holding that because the evidence supported that defendant committed two separate acts, indecency with a child was not a lesser included offense of aggravated assault); *see also Ochoa*, 982 S.W.2d at 907. We overrule Almendarez's fourth issue.

## VI. Conclusion

Having overruled Almendarez's third and fourth issues and having determined that any error associated with his first and second issues was harmless, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: WALKER and MCCOY, JJ.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 1, 2011